Thomas Switch Holdings, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, LLC, I just want to make sure I get. What is it doing in here? Does anyone know? What is it doing in here? Does anyone know?  Okay. Is it running? Okay. Is it running? Yeah? A little bit. Oh. Okay. What do you mean, when we need it? When do we need it? No, when we're doing like an op-op, I mean, just open for. Oh, got it. Understood. I've just never noticed it before. Yeah, me neither. I mean, yeah, I believe it, yeah. Good eye, I didn't even see it. No, that's a young eye. So it's currency day at the 11th Circuit, I think.  Baypoint Capital versus Thomas Switch Holding LLC. Mr. Isbell. Thank you, I'm going to introduce, of course, Don Isbell on behalf of the appellant, Baypoint Capital Partners 2LP. Your Honor, this is an evaluation case submitted from the United States Bankruptcy Court, Northern District of Georgia. We believe that there are at least four grounds for reversal based upon the areas considered by the Bankruptcy Court. The first area, Your Honor, is the choice of going with the cost approach versus other valuation methods. In reaching the conclusion that the cost approach was the standard. I think it might have been error not to select it. I disagree, Your Honor. I think the reason why the cost approach was selected by the Bankruptcy Court was because he said that it fit the definition of a special focus entity. That was defined by Thomas Switch's appraiser to say a special purpose entity is a property appropriate for one use or a limited number of uses or a building that cannot be converted to another use without a large capital investment. That simply was not the case in this issue for the Bankruptcy Court. Instead, what the Bankruptcy Court did is suggest that because there was a large capital investment that that made it unique. It didn't follow the definition of what a special purpose property is. Instead, he created a new definition which said that basically, if you spend a lot of money and you're not going to be able to capture that money, that it's not a special purpose property. One of the things I think that the Bankruptcy Court relied on, correct me if I'm wrong, was that another crypto miner took over the entity and continued to use the property for crypto mining. I think you'd have a better case if the crypto market had tanked and there wasn't anybody interested in this and it was just like sold off as farmland or something. What do we do with the fact that it was, in fact, continued to be used for a special purpose? That goes to my third point, which was the court concluded that the highest and best use was as a crypto mining facility. The problem with that is that the crypto mining facility was just the real property. Crypto mining itself was a business that has both several components. The property, the personal property that in some cases was owned by the borrower or the debtor, in some cases personal property that was owned by the City of College Park, and also a very profitable power contract that was a general intangible that was subject to the lien of Baypoint. That's what had value to this. It's my understanding, and correct me if I'm wrong, but it's my understanding that the only way to benefit from that power contract, which makes sense. Getting the electricity for below market rates would make it all make sense, but the only way to benefit from that power contract was to have a property like this property that was fitted for, I don't know, the voltage and whatnot, but fitted for having so much electricity go through it. I'm not disagreeing with that. The problem is that that thing, Mr. Easterbrook's appraisal, was the $885,000, I believe, that they had to pay the City of College Park to put in the infrastructure that belonged to the City of College Park. So they took that $885,000 of somebody else's property and now said that that gets attributed to this real property. I thought the point was not that they were attributing the other property, but the point was that if you wanted to have a crypto mine, you were going to have to pay this. You were going to at least have to do improvements to the same level that there were improvements on this property. Well, certainly to the extent you're going to get that type of wattage. So to use the contract, you'd have to do this, right? Having a contract that could supply 15 kilowatts was the primary asset, but you do have to have the infrastructure that the City of College Park put in, that it owned, to accept that wattage as well. The problem is, though, is that that is not real property. That's personal property, and that's personal property owned by the City of College Park. The contract is an asset, in general intangible, that Baypoint had a lien on. So what they've done is taken somebody else's property and said that's not a real property that has value, and that's just not the case. They did not do that, incidentally, for the ant boxes and the miners themselves. That's personal property that the debtor paid for. That was their property. It would have made somewhat more sense if they had said these ant boxes and the miners themselves were related to this property, because you've got to still loan from those two because you can't Bitcoin mine without the miners, and you can't do it effectively without the ant boxes that cool the miners. So they're saying, in this instance, we're going to use it because, well, we just decided to. In this instance, we're not. Let me ask you this. It seems to me that we have to review this for clear error. What do you think about that? Well, I think that on the tool choosing, the cost approach, I think that both parties agree in their papers that that's reviewed de novo. I think that there are some factual issues that might be reviewed clear error. For instance, on the highest and best use cases that were cited by the Pelley suggests that it's both an issue of law and fact, and so there would be issues of review de novo and issues that would be reviewed clear error. And that issue, I would say, even on a clear error standard, the court committed clear error because it found that the highest and best use was as a Bitcoin mining facility. He did that not based upon any evidence of its feasibility. He did that simply because it was sold to someone who wanted a Bitcoin mine. Now, at the time, in Mr. Easterbrook's appraisal, he noted that Bitcoin mining was not a profitable business at that time. In fact, he lost money for every Bitcoin he mined at that time. So there was no feasibility that it was going to continue to make money. It was actually losing money, and the business was already in bankruptcy. Let me ask you this question. Under the Bankruptcy Code, courts are supposed to determine value in light of the purpose of the valuation and of the proposed disposition or use of the property. And here, the purpose of the valuation wasn't to determine what an objective buyer would pay. It was to determine, to allocate the proceeds that actually were received. So even if we assume that the purchaser overpaid because of some mistaken belief about crypto mining, why does that matter? Don't we still need to allocate what was actually paid for the mining property? I can certainly see that argument, but the difference, Your Honor, is that what was paid for the property, the real property. What was paid for the real property? In this case, they have taken value from collateral that belonged to Baypoint and from collateral that belonged to the City of College Park and confused that, mixed it up, and said now this is all part of the cost approach for this real property. So it's like me saying that my house is worth $2 million because my neighbor's house is worth a million and mine's worth a million. So now on the cost approach, it's worth $2 million. It just doesn't make any sense. You can't take someone else's property and attribute it to your own just for purposes of valuation. Another point of error, Your Honor, was the fact that the court relied upon the tax stamps. I don't think that anybody that spread the record would agree that taking the 4.9 purchase price and simply dividing it by two and spreading it across two parcels is an accurate way to determine value. I think you're right about that, but wasn't the bankruptcy court just saying, look, the question here is just whether this property is worth, we don't have to find out the exact value of the property. We just have to decide whether it's worth, I think, what is it, $700,000 or not? And kind of once you just sort of, you know, kind of back at the napkin math, this is evidence that supports the idea that the property's worth more than $700,000. I mean, why isn't that just, it doesn't seem like an error so much as just maybe not very precise. Well, it's certainly not precise at all, but it was a precise number that was put into the record, 2.45 million. If you looked at that number, there's no way that that could be possibly related to the actual value. And so if you know it can't be related to the actual value, how can you give it any weight? It was simply split between two properties that gave no value to any of the personal property or the value of the business, the general intangibles, and the fact that this power contract was assumed in the sale and extended as part of the sale. Those are things that created the value for this enterprise. The piece of property itself was a piece of property purchased for $50,000 and then put a $60,000 Butler building on it. The improvements that were noted in Mr. Easterbrook's appraisal were all related to the City of College Park's personal property and the infrastructure that they installed and that they generally owned. Yeah, but that the company had to pay them to install, I guess. So that's the issue, right, is that if you wanted to, I mean, it just seems like one of the things that the Bankruptcy Court was doing here is saying if you wanted to run this business, you would need a property like this. And to create that property, you would have to pay, you know, a million dollars to get a property like this one. Why isn't that okay? Because by paying that million dollars, you get the benefit. And the benefit here is the discounted power contract. So they could have protected themselves by getting a lien on the general intangibles like they pointed out when they made the deal. They chose not to. They took a lien just on the real property. So now what your Honor is suggesting, which is what the Bankruptcy Court did, they've now taken general intangibles. The value that you got for that $885,000 investment was the power contract. That's actually in the record. That was the quid pro quo. That was our collaborative. Yeah, what if, I mean, so I guess this isn't exactly analogous, but to use a more analog hypothetical. I mean, if this were a gold mine, right, this guy buys some property and he, you know, he believes there's gold underneath the property and he goes through the process of digging a mine shaft and whatnot to the property. Would it make any sense to value that property as just like farmland? If there's no gold down there, certainly. Yeah, well, I mean, and then let's say another gold mining company buys it to continue the mining operation. They haven't struck gold yet, you know, but they're going to continue the mining operation. Shouldn't you have, I mean, this just seems kind of artificial to say we're not going to give any sort of anything to the idea of the improvements, the fact that, like, you can only run a gold mine on this property because of the improvements that are made by the other person. Can I add one thing to that? When I have experience in the mining business, and there are comps for mines, whether they be gold mines or coal mines, there are comparative sales. Those are also to be valued based upon the income approach because they generate revenue once they start producing gold income. This is the cost approach. This is something that's rarely used in the appraisal business. I believe the testimony was only 5% of appraisals So he's gone something above and beyond what is normal to force this square peg into a round hole. All right, my time is up. Okay. You've saved a few minutes, Mr. Tanner. Three minutes? Three. Okay. Yeah, I said a few, but yes, it's three. Good morning. My name is Brian Tanner. I represent Thomas Switch here. I know you all are familiar with the record, the briefs. You have the benefit of detailed, thoughtful opinions from the Bankruptcy Court and the District Court on the points that have been raised throughout this litigation now for three years. I do want to address the idea that most of the value from the $4.9 million sale of the debtor's assets somehow adheres in the power sales contract, which we agree, Bay Point, not Thomas Switch, has a priority position. We don't have to argue with you. We do not argue that that agreement has no value. But the question is how much of the $4.9 million can really be achieved. All I need is $700,000. That's 14%. That's a seventh. There are a lot of reasons why that power agreement should not have a lot of value placed on it. One is at the time of the sale, which was in 2020, that power sales agreement was over half over. It was a five-year agreement that started at the beginning of 2018. Bay Point even says in its brief on page 19, it's talking about some testimony from our appraiser, but it admits, it says we conceded, so I assume they like this fact, that most of the right to purchase discounted electricity under that agreement was in fact consumed by debtors prior to the sale. The agreement, again, was from January 2018 to the end of 2022. The first three years had a discounted electrical rate, and in the last two years, which we were getting really close to at the time of the sale, that rate went up. The power agreement was terminable by either party within 30 days, so the City of College Park, for whatever reason, could have said, we're going to walk away from this agreement with the debtor. In fact, by explicit language of that power agreement, it was not assignable without consent of College Park, and upon the debtor's bankruptcy, shall be terminated. Not may be by the City of College Park, but shall be terminated. And so interestingly here, the sale happens in June 2020, and this is a part of the record, and I don't feel like I'm bringing up something new here. It's not something that's been focused on, but if you look at the timeline, June 2020 is when the new buyer comes in and consummates the sale. In February of 2020, the City of College Park approves an agreement with the new purchaser for a brand new power sales agreement. That's in the record as Planned Parenthood Exhibit No. 10. So how in the world, at the time of the sale, is there value in the power sales agreement for the new purchaser when they've gone out already and ensured that they have their own agreement with the City of College Park for the continued provision of power to this particular property? I think the answer is, the new buyer, this is a little bit of a speculation, but I don't think much, the new buyer wanted to nail down this issue. And so they did what they needed to do to make sure they had the contract and they weren't relying on something that could be terminated by College Park or that could be terminated because of bankruptcy or that was at the end of a term that was going to result in some increased electrical charges. The other half of this is, there's not a lot of value in this power sales agreement because as the parties stipulated at trial, the City of College Park would continue to provide this power at these rates to any future purchaser of the property. So again, there was no need for the new purchaser to rely on this old power sales agreement to ensure itself that it could use this massively improved property for its intended purpose of cryptocurrency mining. What do you say about, it seems like their best arguments on the other side are, one, the sort of straight down the middle, this was the tax value, and I'm just going to say half to this property, half to the other. So that seems like a good argument on their side. And then the other kind of good argument on their side is that the improvements to the property weren't actually owned by the property holder but were owned by the City. Sure. To start with the tax stamp value, I think both the Bankruptcy Court and the District Court did a good job in their opinions pointing out that it's not something that was really central to the analysis of value. It may have added to it. I think the way the Bankruptcy Court put it is that it preponderated away from the valuation of $48,000 or $50,000. So if you had to choose between whether it supported $700,000 or $48,000 or $50,000, it certainly seemed like it would be more like $700,000. So I think that's the answer. It just doesn't seem very central considering all of the other evidence that we have here presented during the course of a day and a half at the adversary proceeding that both the courts, the Bankruptcy and the District Courts, spent a lot more time on describing in their various orders and their various reasoning. But, you know, the tax stamp value is something that's statutorily required. There is a criminal penalty for doing it wrong. Even Baypoint's appraiser in his testimony at trial and in his report, his appraisal report, talks about how he uses that information and relies on that information at least partially to determine comparable sales. So sometimes you can't get what the actual sales price is, but you can go to the records and look at the deed and see what the transfer tax is paid and work out the purchase price from there. His report says that is a fact point I use in my day-to-day business to come up with comparable sales. Now he says partially in the trial testimony, and I think the follow-up question from Thomas, which is attorney, was, well, what are the circumstances? What would you do? What does partially mean? And the response to that was, well, I'd go and I'd talk to the people involved in the actual sale and see if there was any reason that the transfer tax stamp here was off with respect to the actual valuation. Well, you know, despite recognizing that that's something that he would partially rely on and then would check behind if he thought he needed to do that, he didn't do any of that. And so, you know, it's one of a litany of problems with the alternative valuation that's presented by Bay Point to the bankruptcy court. This appraiser is recognizing that there are these procedures he typically follows, but he just didn't in this case, and I think the tax stamp is an example of that. The idea that we are accounting for personal property. I have a couple of responses to that. One is, the analogy really is, and it was an analogy brought out during the adversary proceeding, it's really about utility access. If I have a piece of property in the middle of the woods that's not connected to sewer, electricity, internet, any of that, it is not as valuable as when that property is hooked up to all of those utilities. Yeah, properties are always affected by surrounding property. And in particular, utility access. Again, this is a principle that is recognized even in Bay Point's own appraisal. He points out, and he was asked at trial, isn't it true that if you don't have utility access, the value of the property is down? He said, yes, that's true. But even more broadly, I mean, the value of the surrounding properties, all of those things go into the mix, right? I think that's right. I think that's right, Your Honor. There's a lot of other people's property that's taken into account in valuing your own property. That's absolutely true. But I really do think that this is not that far off the analogy of just straight electrical access. A piece of property without electrical access is not worth as much as property with electrical access. And if you are intending to use that property for something that requires a super utility, essentially, super access to electricity, it is worth less without that access than it is worth with the access. This property had that access. Replicating that access in some other piece of property we know would cost somewhere around $800,000 to $900,000. And so when you're using the replacement cost approach that was proposed by Thomas Wich's appraisal here, that is perfectly fine to take into account. But Judge Brasher, even if we ignore all that, right, if we knock off all of the personal property or however you want to designate it from this utility access, there's testimony by Kenneth Boudry during the adversary proceeding. He is a professional engineer turned real estate broker who designed and installed the electrical infrastructure on the property, on the property owner's side of it. So after the transformers for the City of College Park, he designed and helped put in all the rest of it. His testimony was it cost $3 million in infrastructure on the property owner's side to build out the property to handle that amount of electrical input, to turn it to an end business use. $1.8 million of that expense, the testimony was, is buried underground in the real estate, in the land, in the dirt. There's no argument in the world by Bay Point that they have a priority lead in that over Thomas Wich's interest in the real estate itself. Right, so that would not be, because it's buried in the ground, that would not be personal property, that would not be something like the, I forgot what they're, the boxes and those things. Yeah, the hand boxes. I think my colleague here alluded to this during his own argument. The answer to that is yes. If it's buried in the ground, I think it's much more easily put in terms of this belongs to the real estate and it's not personal property. The deed to secure debt here that my clients had, though, is not just limited to the real estate. If you read that actual deed to secure debt, it extends real estate and fixtures as identified herein, and part of the identified herein includes power structures and equipment. And so even if you, even if you want to argue somehow that this might fall into a category of personal property, it seems like my client would still have an argument that we have a prior, prior security interest in it. That was an issue that the Bankruptcy Court noted in one of the first pages of its order and dropped a footnote about. It found that it did not need to reach that because, again, it was relying mostly on this value of the utility access, $800,000 or $900,000 from the City of College Park Equipment. It was an issue that was reached by them. I don't think it's necessary for you to reach now, but to your point, Your Honor, I think there are a number of arguments about why even the personal property here might be subject to my client's lien and not Bayport. Let me ask you another question. Was there any effort here to actually do an apple-to-apple comparison and look at what a comparable property with the electrical access and the ability to handle all this electricity would sell for on the open market? It was just a lack of comparison. Both appraisers tried and they looked around and both of them said, look, this is a unique property when it comes to this particular feature. That led our appraiser to pivot to the cost approach. That led their appraiser to value it as essentially a warehouse on a small piece of land in Fulton County. But the answer to that is no. I think the other issue here is why didn't someone talk to the purchaser and why wasn't there testimony about that at trial, about why he spent this amount of money and how he allocated certain things. The best answer I can give to that, I was not at the trial, but what seems to be the case is that the defendants had put a representative of the purchaser on their witness list for the pretrial order and that person was located in Brazil and there was an issue with subpoena and so that testimony was not available to the bankruptcy court to consider at that point. Your Honors, I see I have a few minutes left, but if there are no further panels, I'm happy to rest on the remaining arguments of my brief and thank you for your time. Thank you. Mr. Isbell, you said three minutes. Thank you, Your Honor. I'll try to address everything as quickly as I can. First, Thomas Whitcher's attorney said that there might be a lien that they have on the personal property. They did not file a UCC. There's no UCC in the file, so whatever lien they could have had is nonexistent compared to ours. Secondly, he said that there was testimony about $3 million of improvements, said $1.8 million is underground. None of that was factored into any appraisals valuation. There's no sense that that is actually worth anything in the record. For instance, I've worked on the Michael Vick bankruptcy case a number of years ago. He had a house in Sugarloaf, had the number 7 put everywhere, engraved in his walls, on his carpet. He spent hundreds of thousands of dollars putting number 7 everywhere. At the end of the day, it didn't have any value because it was unique to him. There's no value placed on this infrastructure that he now brings up. As far as Chief Judge Pirley said, the value of the surrounding properties always has an impact on what your property is worth. That's under a comparison approach, a sales comparison approach. If your property is worth something, it elevates everybody else's property. If my neighbor's house is worth $2 million and I bought mine for $500,000, that sales comparison approach means that my property is worth $1 million. It's not the cost approach. The cost approach is where the error was here. Let me just press on that a little bit because it just seems to me, your answer to my gold mine hypothetical was, well, you can look at other gold mines and figure out what the, you know. It just seems like that's just the problem that the bankruptcy court was dealing with here is that there was no comparable property. There was none that were readily available, at least in this jurisdiction. There actually are comps that are nationwide. If you looked at it, you'd have to go on the West Coast. The real problem with the comparables for this type of property was that the value was in the contract. I know people that do bitcoin mining, and they will tell you that if you cannot get a contract for power that's under $0.06 per kilowatt hour, you're going to lose money. This was $0.03 at one point. So they were making, I think the testimony was $4 million a year in savings on the power contract under this contract. And he said that they entered into a new contract. That's not exactly correct. It was assumed, assigned, and amended in the bankruptcy sale process. So they got through with the anti-assignment provisions by consent as part of the sales process in bankruptcy. So it was an amended contract, not a brand new contract. I think I've hit all the points. So the cost approach measures the value by calculating the current cost of reproducing or replacing the improvements. Less depreciation plus land value, right? Correct, Your Honor. So land value would take into account surrounding property. For the land that they bought for $50,000. Yeah, right. Okay. I think we understand.